CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

August 23, 2024

LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Action No. 5:23-cr-00011 |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| ELIZABETH ANNE CATHERINE | ) | By:   Hon. Thomas T. Cullen |
| KEEGAN, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' objections to the initial presentence investigation report, as revised ("PSR"). The two primary objections that remain outstanding are (1) Defendant Elizabeth Anne Catherine Keegan's ("Defendant") objection to the PSR's 10-level enhancement for the calculated loss amount under U.S.S.G. § 2B1.1; and (2) the Government's objection to the PSR's lack of an obstruction enhancement under U.S.S.G. § 3C1.1. The parties also disagree about whether the evidence shows that Defendant's mother, Lena Keegan ("Lena"), is dead, and they made myriad ancillary objections that do not affect Defendant's offense level.

On June 27, 2024, the court held a hearing where the parties presented evidence and arguments related to their objections. Based on that evidence, the court finds that the Government has established by a preponderance of the evidence that Lena died in October 2019; that Defendant's subsequent use of her financial assets was unauthorized; and therefore that the loss amount attributable to Defendant exceeds $150,000. But as explained below, it has not established that Defendant obstructed justice. Accordingly, the court will overrule the parties' two main objections and sustain in part and overrule in part their ancillary objections.

## I.   PROCEDURAL POSTURE

On January 29, 2024, Defendant pleaded guilty to both counts of a two-count Superseding Information, which charged her with unlawful use of a means of identification, in violation of 18 U.S.C. §§ 1028(a)(7), (b)(2), and access-device fraud, in violation of 18 U.S.C. §§ 1029(a)(5), (c)(1)(A)(ii). (ECF Nos. 44, 49.) The court accepted Defendant's plea and adjudged her guilty of both offenses. (*See* ECF No. 47.)

As required by Federal Rule of Criminal Procedure 32, the U.S. Probation Office subsequently filed an initial PSR,[1] to which both parties filed objections. (ECF Nos. 57–58, 60–61, 64.) Because of the scope of their initial objections, the court bifurcated Defendant's sentencing. (*See* ECF No. 62.) On June 27, the court held the first sentencing hearing at which the parties presented evidence about the loss amount and whether Defendant obstructed justice. The court also sustained the parties' objections to the PSR's sophisticated-means enhancement (*see* ECF No. 73) and heard a victim-impact statement at the hearing. In light of the voluminous evidence adduced at that hearing, the court ordered the parties to file supplemental briefs on their outstanding objections. (*See id.*; Gov. Br. [ECF No. 83]; Def. Br. [ECF No. 84].) The second sentencing hearing is set for October 9, 2024, and primarily will be devoted to any additional victim-impact statements, argument, allocution, and imposition of the sentence.

---

[1] The operative initial PSR is the second revised version, filed on May 6, 2024. (ECF No. 59.) Probation previously filed an original version of the initial PSR on April 10 (ECF No. 52) and a first revised version on April 11 (ECF No. 53).

After thoroughly reviewing the evidentiary record and the parties' filings, the court issues this Memorandum Opinion to set forth its findings of fact and conclusions of law on the outstanding objections.

## II.   LOSS AMOUNT

The court first considers Defendant's objection to the PSR's 10-level enhancement, under U.S.S.G. § 2B1.1(b)(1)(F), for a loss amount in excess of $150,000.

### A.  Standard of Review

A key issue for the loss-amount enhancement is whether a preponderance of the evidence establishes that Lena is dead.[2] The court, therefore, reviews the legal standard for both the presumption of continued life and the loss-amount enhancement.

### 1.  Presumption of Continued Life

"It is well settled . . . that there is a presumption of the continuation of life." *duPont de-Bie v. Vredenburgh*, 490 F.2d 1057, 1060 (4th Cir. 1974). Under that presumption, a person is presumed to be alive until sufficient proof is offered to the contrary, or until a presumption of death arises. *See id.* The party seeking to rebut the presumption has the burden of proving by a preponderance of the evidence that the person has died. *See id.* When a person is not heard from, the presumption of life "may be shortened by . . . facts and circumstances connected with the disappearance of the person . . . and circumstances connected with [her] habits and customs of life . . . [that] would show . . . by a preponderance of the evidence that

---

[2] Although it is not strictly necessary to determine that Lena is dead for the 10-level loss-amount enhancement to apply here, whether she passed away is highly relevant to establishing if Defendant had Lena's authorization to use her financial assets. If Lena died in October 2019, as the court finds, she could not have authorized Defendant's use of her accounts after that date. Additionally, even assuming *arguendo*, that Lena gave Defendant authorization to use her accounts before she died—although a preponderance of the evidence refutes that she ever did—that authorization would have expired at Lena's death.

the person [is] dead." *Fid. Mut. Life Ass'n v. Mettler*, 185 U.S. 308, 316 (1902) (cleaned up); *see* 45 Am. Jur. *Proof of Facts* 3d 307 §§ 2–3 (updated July 2024) (explaining the same). Whether a person is dead is a question of fact to be determined based on all of the relevant evidence. *Mettler*, 185 U.S. at 316; *cf. Peak v. United States*, 353 U.S. 43, 46 (1957) (noting that the trier of fact determines the date of a person's death).

### 2. Loss Amount

U.S.S.G. § 2B1.1(b)(1) directs a court to increase a defendant's total offense level by 10 if the loss associated with the offense is more than $150,000 but less than or equal to $250,000. The loss is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). When a defendant challenges an enhancement under U.S.S.G. § 2B1.1(b)(1), the Government must establish the loss amount by a preponderance of the evidence. *United States v. Shephard*, 892 F.3d 666, 673 (4th Cir. 2018). The court then must make a finding of fact about the correct loss amount under the Guidelines. *See United States v. Wolf*, 860 F.3d 175, 196 (4th Cir. 2017).

## B. Findings of Fact

### 1. Presumption of Continued Life

For the reasons explained below, the court finds by a preponderance of the evidence that the Government has rebutted the presumption of life and has shown that Lena died in October 2019.

#### a. Defendant's and Lena's Characteristics

The parties presented a considerable amount of information about Defendant's and Lena's personal characteristics and familial relationships at the June hearing. The court, therefore, begins by briefly summarizing that evidence.

Defendant is a 60-year old woman who at all relevant times lived in Woodstock, Virginia ("Woodstock"), in Shenandoah County. Her mother, Lena, lived in Woodstock as well, but has not been seen or heard from since October 2019. (Hr'g Tr. 75:5–76:5; 85:8–12 [ECF No. 77].)

Defendant has three children: Michael Brandon Chaplin ("Brandon"), Travis Chaplin ("Travis"), and Sarah Combs. (PSR ¶ 58 [ECF No. 59].) Her children are currently not speaking to her. (*Id.*) Brandon testified at the evidentiary hearing, and Travis and Sarah shared information with law enforcement during their search for Lena.

At the time of her disappearance, Lena was approaching 90 years old. (*See, e.g.*, PSR ¶ 56.) The evidence supports that Lena was eccentric and had strained relationships with certain family members. Her son George Keegan, III ("George") told an investigator that Lena abandoned him as a child and caused her husband to die in 1993 by withholding his medication. (Hr'g Tr. 72:19–73:2; PSR ¶¶ 23, 56.) Her daughter Connie Kersey ("Connie") similarly had a challenging relationship with Lena, including criticizing her parenting and describing her as a mean person. (*See* Hr'g Tr. 139:15–20; Def. Ex. 3 [ECF No. 72-15].) Still, Connie shared a victim-impact statement at the June hearing and expressed deep grief about her mother's disappearance. (*See* Hr'g Tr. 177:24–181:23.) Lena's niece Karen Sue Burnett ("Karen") characterized Lena as "quirky," having "some psychosis," and being "whacked out." (*Id.* 153:20–21; Def. Ex. 4 [72-16].) Karen also told law enforcement that Lena believed her deceased sister "invaded her body in the night and stole all her energy." (Hr'g Tr. 74:23–

25.) Lena apparently believed in holistic medicine and was a member of the Edgar Cayce Foundation[3] (*id.* 96:23–97:1); she did not have a regular doctor or pharmacist (*id.* 76:9–12).

### b. Lena's Location and Communication

In 2017, Lena's grandson Brandon moved to Woodstock to help take care of his grandmother. (*Id.* 23:23–24:1.) At the evidentiary hearing, Brandon testified about Lena's living situation in Woodstock. When Brandon was caring for Lena, she was largely immobile; needed help climbing the stairs to her bedroom; and rarely left her home, despite living in squalor. (*Id.* 29:22–25, 30:3–7.) Other family members lived in, or near, Woodstock as well but generally did not help with Lena's day-to-day activities. (*Id.* 24:6–10, 30:11–14.) Defendant, however, occasionally stopped by Lena's house, including to help Lena pay her bills and get money from her. (*Id.* 25:16–21, 30:15–16.) Brandon left Woodstock in 2018 because of a falling out with Defendant and Lena "badmouthing" him in public. (*Id.* 27:15–20, 34:17–22.)

The last verified sighting of Lena occurred on October 9, 2019, when she visited her chiropractor. (*Id.* 85:8–19.) In August 2021, the Woodstock Police Department ("WPD") opened a missing-person case after receiving a tip, from the then-girlfriend of Defendant's ex-husband, that Lena had not been seen for a very long time. (*Id.* 46:7–11, 62:24–63:13.)

Except for Defendant, Lena's family members have consistently stated they do not know where Lena is and have not spoken to her in years. (*See, e.g.*, *id.* 28:2–23, 85:24–86:13.) Similarly, none of Lena's neighbors have seen her recently. (*Id.* 91:6–9.) Defendant, on the other hand, has told various tales about Lena's supposed whereabouts and communications.

---

[3] "The majority of Edgar Cayce's readings deal with holistic health and the treatment of illness." *Explore Edgar Cayce's Readings*, Edgar Cayce's A.R.E., www.edgarcayce.org (last visited Aug. 23, 2024).

In terms of Lena's location, Defendant told law enforcement that Lena was living in Virginia Beach with a love interest named "Jack Fisher or potentially Jacques Fisher." (*Id.* 47:15–20.) Defendant described Mr. Fisher as a wealthy individual who lived on an estate, but Defendant did not share an address for where her mother was supposedly living with him. (*Id.* 47:21–48:4.) During a call with Investigator Travis Pence—WPD's lead investigator for the missing-person case—Defendant said that Mr. Fisher and his driver came to Woodstock to pick Lena up, loaded what they could fit in their car, then left with Lena. (*Id.* 51:10–12.) During a later interview, Defendant claimed that Lena and Mr. Fisher travelled to the Netherlands to avoid COVID-19. (*Id.* 51:23–25.)

There is some evidence to arguably support Defendant's claim that Lena met up with a lover or otherwise travelled somewhere away from Woodstock. Lena's grandson Travis told a grand jury that Lena may have said she planned to meet up with an old lover. (*Id.* 148:9–22; Def. Ex. 8 [ECF No. 72-19].) When pressed on this point, however, he was uncertain that his recollection was accurate. (Hr'g Tr. 148:23–25; Def. Ex. 8.) In terms of travel, Lena's niece Karen told law enforcement that Lena travelled internationally for an extended period on at least one prior occasion. (Hr'g Tr. 153:9–11; Def. Ex. 4.) But if true, that travel was long ago because the United States Secret Service's ("USSS") uncontradicted records establish that Lena has not had an active passport since 1979. (Hr'g Tr. 90:17–20.) Additionally, despite that past travel and Lena's quirkiness, Karen was concerned by the fact that, in the instant situation, there was "absolutely no way to contact" Lena in Virginia Beach or internationally. (*See* Def. Ex. 4.)

A deluge of other, objective evidence proves, by a preponderance, that Defendant's claims about Lena's location are false. Brandon testified that Lena never mentioned having a boyfriend in Virginia Beach. (Hr'g Tr. 30:17–24.) Lena's neighbors never saw a vehicle pick her up and move her out of Woodstock. (*Id.* 91:10–15.) And, most significantly, law enforcement could not locate Lena in Virginia Beach—or anywhere else—despite a diligent search for Lena and her purported love interest, Mr. Fisher. The WPD and USSS both unsuccessfully looked for Lena and Mr. Fisher in 2021 and 2022, with the assistance of the Virginia Beach Police Department. (*Id.* 50:2–11, 88:17–90:4.) Law enforcement also searched Lena's financial accounts, which did not indicate activity outside of Shenandoah County (*id.* 16:5–10; PSR ¶ 7) and stopped being used for items associated with day-to-day life after October 2019 (Hr'g Tr. 97:11–99:2). USSS further combed numerous databases to try to find information about new addresses, phone numbers, bank accounts, credit cards, state identification documents, police reports, utility accounts, airline reservations, or other records associated with Lena. (*See* Hr'g Tr. 87:3-88:16, 131:22-132:4.) USSS contacted its retail and financial-institution partners as well to try to find any trace of Lena's location. (*Id.*) They were unable to identify a single indicia of Lena's continued existence. As such, the court finds as a fact that Lena is not living in Virginia Beach or internationally, she did not move away with a paramour, and she died in or near Woodstock in October 2019.

In terms of communications, the evidence shows that Lena had different levels of contact with her family members prior to disappearing. She did not speak to her son George (*id.* 72:16–18), her daughter Connie (*id.* 139:15–17; Def. Ex. 3), or her niece Karen (Hr'g Tr. 74:10–12). She spoke to her grandsons, Travis and Brandon, but the frequency of their

- 8 -

communications varied. Travis would "go years without ever talking" to Lena, "and then . . . go a year with . . . nonstop talking." (*See id.* 149:6–8; Def. Ex. 8.) Similarly, Brandon frequently communicated with Lena when he lived in Woodstock and shortly after he left, but their conversations eventually tapered off to "about once a month and then nothing." (Hr'g Tr. 27:21–28:1.) One person who Lena used to frequently communicate with was Defendant. Defendant called Lena's home 397 times from January 1–October 9, 2019. (*Id.* 16:15–25.) Those calls abruptly stopped as of October 10, 2019. (*Id.* 16:21–22.) Indeed, there is no proof of Lena communicating with *anyone* after early-October 2019.

Defendant, nevertheless, claims that Lena communicated with her long past 2019. In an August 2021 interview with Investigator Pence, Defendant said she spoke with Lena as late as March 2021 and that Lena left her a voicemail that month. (*Id.* 48:14–17.) But when Investigator Pence asked to hear the voicemail, Defendant said that she had deleted it or did not have it. (*Id.* 49:4–10.) In that same interview, Defendant gave Investigator Pence a phone number with a 757 area code (the "757 Number"), which she claimed belonged to Lena. (*Id.* 17:1–11; PSR ¶ 12.)

The evidence establishes that Lena never used the 757 Number. Defendant activated the phone number in November 2019 using her own address, email, and Verizon account. (PSR ¶ 12.) Seemingly in an effort to tie the number to Lena's alleged location, Defendant also specifically requested that it have a Virginia Beach area code, rather than a Shenandoah County area code. (Hr'g Tr. 94:13–95:5; Gov. Ex. 3 [ECF No. 72-3].) USSS Investigative Analyst Mary Epstein credibly testified, however, that the phone associated with the 757 Number never left Shenandoah County and its calls were generally not long enough for a conversation. (Hr'g Tr.

92:15–21.) The only evidence of full-length calls from the 757 Number were calls that Defendant made herself to cancel Lena's car insurance and inquire about Lena's tax payments. (*See id.* 17:13–23, 60:8–62:3; Gov. Ex. 2 [ECF No. 72-2]; PSR ¶ 15.) Accordingly, the court finds as a fact that the 757 Number belonged to Defendant, not Lena, and was used to conceal the fact of Lena's death.

There is also no evidence of Lena using other forms of communication after October 2019. USSS's search of Lena's email did not reveal any correspondence after she disappeared, except for a few administrative messages—such as payment-confirmation and change-of-address emails—which circumstantial evidence suggests were prompted by Defendant's attempts to impersonate Lena. (*See* Hr'g Tr. 106:10–113:13; Gov. Ex. 11 [ECF No. 72-11].) The email search did not reveal any travel plans or other information about Lena's location either. (Hr'g Tr. 112:23–113:13.) And it certainly did not uncover messages with a lover named Jack or Jacques Fisher.

In short, despite a years-long investigation, law-enforcement agencies have not been able to verify Lena living outside of Woodstock, communicating with anyone, or otherwise being alive after October 2019. (*Id.* 62:5–7.) Defendant attempts to explain Lena's total disappearance as harmonious with her eccentricities, her somewhat contentious familial relationships, and the stray comment she may have made to one of her grandsons about meeting up with an ex-lover. (*See generally* Def. Br. at 8–16.) The court credits Defendant's counsel for her zealous advocacy, and agrees evidence supports that Lena had certain unorthodox traits, but the smattering of random evidence about those traits does not overcome the great weight of evidence to the contrary.

After carefully considering the totality of the facts and circumstances presented at the evidentiary hearing—including the complete absence of any indication of life from Lena for nearly five years, her advanced age when she went missing, her previous health difficulties, and Defendant's lies about Lena's phone number and living situation—the court finds, based on a preponderance of the evidence, that the Government rebutted the presumption of Lena's continued life and that Lena died in October 2019.

### 2. Loss Amount

Because a preponderance of the evidence establishes that Lena died in October 2019 and Defendant was not authorized to use her financial accounts after her death, the court further finds that the loss attributable to Defendant exceeds $150,000.

The evidence demonstrates that Lena was financially stable. She received a significant amount of income each month from Social Security and as the beneficiary of her late-husband's Defense Finance Accounting Service ("DFAS") payments. (*See* Gov. Ex. 7 [ECF No. 72-7]; PSR ¶¶ 23, 25.) She had some debt as well. When she went missing, she owed the IRS approximately $50,000 (Hr'g Tr. 138:11–16) and had a home equity line of credit ("HELOC") with a balance close to $49,000 (Gov. Ex. 9 [ECF No. 72-9]).

Lena's financial situation allowed her to give money to family members. For example, she bought her grandson Travis a house in 2018. (Hr'g Tr. 34:23–24, 73:13–17.) She also gave her grandson Brandon approximately $500 per month when he helped take care of her in Woodstock. (*Id.* 33:1–5.)

Lena gave Defendant money too. Before her disappearance in October 2019, Lena consistently paid for at least part of Defendant's mortgage and miscellaneous living expenses

for Defendant and her daughter. (*See id.* 135:15–138:7; Gov. Ex. 6 [ECF No. 72-6]; Def. Ex. 6 [ECF No. 72-18].) The exact amount Lena gave Defendant varied each month, but USSS's analysis of Lena's financial records revealed that she paid Defendant an average of $2,591.18 per month from January to October 2019. (Hr'g Tr. 115:23–116:3; Gov. Ex. 6.) The record evidence also establishes that Lena paid Defendant by personally writing and signing checks to her each month, rather than having Defendant sign for her, adding Defendant as a signatory on her accounts, or using an electronic transfer. (*See* Hr'g Tr. 24:15–26:13, 98:19–99:2; Def. Ex. 2 [ECF No. 72-14].) Brandon testified that—out of the blue in September 2018— Defendant said to him that "if she found [Lena] deceased, she would stick [Lena] in a freezer and collect the money." (Hr'g Tr. 26:14–27:13.) Although Defendant operated a small business in Woodstock for several years, she closed her business before Lena disappeared (*id.* 142:6– 10) and did not work after Lena disappeared (*see* Def. Exs. 2–3). Together, this evidence provides a strong inference that Defendant was reliant on Lena's income and recognized that reliance.

After Lena went missing, the payments from her bank account to Defendant materially changed. In 2020, Defendant received an average of $4,859.58 per month from Lena's account, an increase of over $2,250.00 (or 87%) compared to what Lena paid Defendant from January to October of the previous year. (*See* Hr'g Tr. 116:4–9; Gov. Ex. 6.) How Defendant received the payments also changed. In 2021, Defendant began receiving a large portion of the payments by way of electronic funds transfer instead of by check. (Hr'g Tr. 99:10–22.) For the first time, Lena's accounts also began making electronic funds transfers to pay off credit cards—credit cards that Defendant pleaded guilty to fraudulently using. (*Id.* 100:4–12.)

Moreover, the court finds that, after Lena's disappearance, Defendant took a number of illegal and deceptive actions related to Lena's assets. As discussed, Defendant pleaded guilty to (1) fraudulently accessing Lena's U.S.A.A. credit card account and (2) forging a notary's signature on a power of attorney in an attempt to sell two of Lena's properties after she disappeared. Lena's checkbook, debit card, and credit cards were also found in Defendant's home in June 2022, including a credit card and checks that were issued after Lena went missing. (*Id.* 100:13–103:11; Gov. Ex. 4 [ECF No. 72-4].) Additionally, after Lena's disappearance, Defendant changed Lena's address with the U.S. Postal Service to Defendant's address. (Hr'g Tr. 110:4–111:18; Gov. Exs. 11–12 [ECF Nos. 72-12].) Defendant took these steps because she could not have otherwise accessed Lena's accounts; she was not a signatory on the accounts and did not have a power of attorney for them (Hr'g Tr. 123:2–17).

Defendant's actions allowed her to obtain the federal funds that continued to get deposited into Lena's bank account after she disappeared. Federal funds totaling $181,176.20 went into Lena's account after October 2019: $150,190.00 in DFAS payments, $27,786.20 in Social Security benefits, and $3,200.00 in IRS tax refunds. (*Id.* 118:14–16; Gov. Ex. 7.) By January 2022, all of those funds were spent and the account had a negative balance. (Hr'g Tr. 20:19–21:3; PSR ¶ 27.)

After October 2019, Defendant also drew $8,800 from Lena's HELOC into Defendant's personal accounts. (*See* Hr'g Tr. 20:11–16, 120:15–121:9; Gov. Ex. 9; PSR ¶ 21.) The bank later foreclosed on Lena's house because her HELOC went into default for missed payments on the outstanding balance. (*See* Hr'g Tr. 121:14–15; Gov. Ex. 10 [ECF No. 72-10].)

A detailed USSS analysis—which considered each of Lena's accounts that Defendant accessed—demonstrated that Defendant used approximately $180,000 of Lena's money after she went missing. (*See* Hr'g Tr. 126:11–14; Gov. Ex. 13 [ECF No. 72-13].) This amount included money withdrawn or spent directly from Lena's bank account, Defendant's use of Lena's HELOC, and Defendant's fraudulent use of Lena's credit cards. (Hr'g Tr. 124:21–125:14.) The amount excludes any payments that benefitted Lena or her estate, including utilities and tax payments; it excludes finance and interest charges as well. (*Id.* 124:25–125:6.) The court considers the USSS analysis reliable and finds by a preponderance of the evidence that Defendant took $180,653.88 from Lena's accounts for her own benefit after Lena disappeared.[4]

At bottom, the evidence establishes that Lena died in October 2019 and Defendant did not have authorization to take her money after that time. The loss attributable to Lena under U.S.S.G. § 2B1.1 is $180,653.88.

## C. Conclusion of Law

Defendant acknowledges that if the court finds that Lena was deceased or Defendant otherwise lacked Lena's authorization to use her financial accounts, then her offense level will be increased by 10 levels due to the loss amount. (*See* ECF No. 68 at 4.) The Guidelines are clear that a 10-level enhancement applies for a loss of greater than $150,000 but less than or equal to $250,000. *See* U.S.S.G. § 2B1.1(b)(1)(F). Because the court's factual finding on the loss

---

[4] This calculation excludes the amounts the Government agreed to remove following Defendant's objections (*see* Gov. Br. at 10 n.8) and the $365 payment Defendant made for a dumpster, which was used to clean out Lena's warehouse. A preponderance of the evidence does not establish that the use of the dumpster inured to Defendant's benefit.

amount falls within that range, the 10-level enhancement applies to Defendant's conduct and

her objection to this enhancement in the PSR will be overruled.

### III.   OBSTRUCTION

Next, the court turns to the Government's objection about the PSR omitting a 2-level

obstruction enhancement under U.S.S.G. § 3C1.1.

### A.  Applicable Guidelines Provision

The Guidelines state that a defendant's offense level shall be increased by 2 levels if:

> (1) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice with respect
> to the investigation, prosecution, or sentencing of the instant
> offense of conviction, and (2) the obstructive conduct related to
> (A) the defendant's offense of conviction and any relevant
> conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. Not all false statements amount to obstruction. Relevant here, the

enhancement is only justified as a result of non-sworn statements to law enforcement if the

statements were material and "significantly obstructed or impeded the official investigation or

prosecution of the instant offense." *Id.* cmt. n.4(G). Otherwise, "false statements, not under

oath, to law enforcement officers" do not warrant the enhancement. *Id.* cmt. n.5(B).

### B.  Findings of Fact

As discussed in connection with the loss-amount enhancement, the evidence

establishes that Defendant lied to law enforcement about Lena possessing the 757 Number

and about Lena living in Virginia Beach or internationally. Those lies were made in the context

of police interviews, not under oath. (*See* Gov. Br. at 13.) It is true that law-enforcement

agencies spent resources disproving these statements, including tracking the location and calls

from the 757 Number, searching for Lena and her purported lover in Virginia Beach, and

looking for any indication of travel by Lena. But their investigation was not impeded by Defendant's lies. Indeed, the WPD's lead investigator testified that, from early on in the case, he was "dubious about" and "didn't have any reason to believe" Defendant's claims about Lena being with a lover in Virginia Beach or the Netherlands. (Hr'g Tr. 66:2–4, 77:7–9.) The investigations that stemmed from Defendant's false statements also resulted in the Government obtaining significant evidence to prove Lena's death, Defendant's fraud, and the loss amount. Accordingly, the court finds that Defendant's lies to law enforcement did not significantly obstruct or impede the Government's investigation or prosecution.

## C.  Conclusion of Law

The court concludes that the obstruction enhancement does not apply to Defendant's conduct. The evidence shows that Defendant lied to investigators, but "a lie to an investigator by itself does not usually warrant an enhancement unless it substantially interferes with the government's investigation." *United States v. Brown*, 857 F.3d 334, 341 (6th Cir. 2017); *see* U.S.S.G. § 3C1.1 cmt. n.4(G). Defendant's lies did not do so, and the record does not establish that she took other obstructive action, such as attempting to destroy evidence to hinder the investigation. *Contra United States v. Hill*, 664 F. App'x 341, 343 (4th Cir. 2016). The court admonishes Defendant for her deceit and credits law enforcement for a thorough investigation of her reprehensible conduct, but the Guidelines are clear that such lies, without more, do not justify applying the obstruction enhancement. As such, the court concludes that a two-level obstruction enhancement under U.S.S.G. § 3C1.1 does not apply to Defendant's conduct, and it will overrule the Government's objection on this issue.

## IV.    ANCILLARY OBJECTIONS

In addition to their two primary objections, the parties also made a number of ancillary objections to the PSR in various filings. These objections do not affect Defendant's Guidelines range. The court's ruling on these objections are set forth below.

### A.  Objections: Sustained and Overruled

#### 1.  Government's Objections

*Paragraph 4*:[5] The Government objects to this paragraph not mentioning that M.P. is Lena Frances Keegan, Defendant's mother. (ECF No. 57 at 1.) The court will sustain this objection because the information about Defendant and Lena is now public. Any privacy concerns are also mitigated because the PSR is a sealed document.

*Paragraph 22*: The Government objects to this paragraph excluding certain information about the debit card and credit cards found in a search of Defendant's home. (*Id.* at 1–2.) The court will sustain this objection based on the evidence presented at the June hearing. The paragraph shall be revised to include the information the Government seeks to add, except the word "activated" in the objection shall be revised to "issued," given Defendant's objection to the same paragraph. (*See* ECF No. 61 at 7–8; Hr'g Tr. at 102:17–21.)

*Paragraphs 23–25 & 29*: The Government's objection to these paragraphs states the restitution it is seeking overall and for specific federal entities. (ECF No. 57 at 2.) This objection will be sustained in part and overruled in part. Given the record evidence—namely, the USSS analyst's testimony and accompanying exhibit (*see* Hr'g Tr. 124:11–126:14; Gov. Ex. 13)—the court will sustain the restitution amounts that the Government seeks for each federal entity, but overrule the total restitution amount of $220,671.09. The court finds that the total restitution shall equal the total loss amount of $180,653.88. The federal entities shall receive as restitution the amounts that the Government set forth in this objection: (1) $150,190.00 to DFAS, (2) $3,200.00 to the Internal Revenue Service, and (3) $25,623.55 to the Social Security Administration. Lena's estate shall receive the balance of the restitution.

*Paragraph 68*:[6] The Government objects to this paragraph not noting the proceeds Defendant received from the sale of her house. (ECF No. 57 at 2.) The court will overrule this objection because the Government failed to present evidence to support it at the June hearing.

---

[5] The paragraph numbers in this section refer to the paragraphs in the operative PSR. (ECF No. 59.)

[6] The Government's objection lists paragraph 67, instead of paragraph 68, because the objection was filed after the first revised initial PSR (ECF No. 53) but before the operative PSR (ECF No. 59). Paragraph 67 in the first revised initial PSR matches paragraph 68 in the operative PSR.

## 2. Defendant's Objections

*Release Status*: Defendant objects to her release status not indicating she was in custody on related state charges from October 12–26, 2021. (ECF No. 64 at 1.) The court will sustain this objection insofar as the Defendant presents evidence to the U.S. Probation Officer to verify this claim or the Probation Officer independently substantiates it.

*Paragraph 8*: Defendant objects to this paragraph's description of the initial report to law enforcement about Lena being missing and her statement about putting Lena in a freezer. (*Id.* at 2.) This objection will be sustained in part and overruled in part. Specifically, the paragraph shall be amended to reflect that Betsy Lanhart reported Lena missing and that Lena was last heard from in October 2019, but not that Betsy spoke with Lena that month. The third sentence shall be amended to align with Brandon's testimony at the June hearing about the freezer comment, including to remove the reference to $10,000. (*See* Hr'g Tr. 26:19–21, 39:15–21.)

*Paragraph 9*: Defendant objects to a mistaken year in this paragraph and the characterization of her conversations with law enforcement about how much she spoke to and received each month from Lena. (ECF No. 64 at 2.) The court will sustain her objections to the mistaken year and the frequency of her phone calls with Lena; "2023" shall be revised to "2021," and "once a week" shall be stricken. The court will overrule Defendant's objection to the PSR stating she told law enforcement that Lena gave her $2,400 per month because the only evidence on this point came from the credible testimony of Investigator Pence, who corroborated the PSR's description.

*Paragraph 10*: Defendant lodges a number of objections to this paragraph. (*Id.* at 2–3.) The objections will be sustained in part and overruled in part. The paragraph shall be amended to align with this Memorandum Opinion's findings of fact about Lena's contact and relationships with her family and about where Defendant claimed Lena lived.

*Paragraph 13*: Defendant objects to this paragraph, arguing that Lena's lack of response to the foreclosure of her home does not have any probative value. (*Id.* at 3.) The court will overrule this objection. The record establishes that First Bank mailed Lena notice about the foreclosure (*see* Gov. Ex. 10), and the court finds that Lena's lack of a response is probative evidence.

*Paragraph 14*: Defendant objects to this paragraph's suggestion that Lena is dead. (ECF No. 64 at 3.) The court will overrule this objection; for the reasons explained in this Memorandum Opinion, the court finds that Lena died in October 2019.

*Paragraph 16*: Defendant objects to the first sentence of this paragraph stating that she attempted to sell two of Lena's properties. (*Id.*) The court will overrule this objection. The undisputed evidence indicates that Defendant tried to sell two of Lena's properties. The first

sentence of this paragraph, therefore, accurately states that Defendant took steps to sell the properties, even if she later abandoned those efforts.

*Paragraph 17*: Defendant objects to the statement that she told law enforcement Lena gave her $2,400 per month. (*Id.* at 3–4.) The court will overrule this objection for the same reason it will overrule her similar objection to paragraph 9.

*Paragraph 18*: Defendant objects to this paragraph excluding the name of the person who received the $5,525 from Lena's bank account, not describing why he received the money, and not listing the other gifts Lena had given him. (*Id.* at 4.) The court will sustain the objection because the parties stated at the June hearing that this paragraph was not contested "except to name the family member." (Hr'g Tr. 19:11–12.) The paragraph shall be revised to include the information noted in Defendant's objection.

*Paragraph 22*: Defendant opposes the Government's proposed additions to this paragraph; specifically, the statement that Defendant "activated" the credit card ending in -5185. (ECF No. 61 at 7–8.) The court will sustain this objection insofar as paragraph 22 shall not state the card was "activated," but, as described above, the paragraph shall otherwise be revised to include the Government's additions.

*Paragraphs 28–29, 36, 71,[7] & 84*: Defendant objects to the loss amount, restitution, and attendant enhancement described in these paragraphs. (ECF No. 64 at 4.) This objection will be sustained in part and overruled in part. These paragraphs shall be revised to align with the court's factual findings and conclusions of law in this Memorandum Opinion.

*Offender Characteristics*: Defendant objects to certain descriptions about personal and family information in Part C of the PSR. (*Id.* at 4–5.) The court will sustain these objections insofar as the U.S. Probation Officer shall (1) add a new paragraph to the PSR about Defendant's account of her upbringing and relationship with her family, provided that this information is not in conflict with other findings in this Memorandum Opinion or the PSR; and (2) amend the relevant paragraphs about Defendant's medical history, and its impact on her ability to work, provided that the conditions noted in these objections align with the medical records Defendant indicated that she provided to Probation.

## B.  Objection: Taken Under Advisement

*Special Conditions of Supervision*: Defendant objects to proposed Special Condition 2 of supervised release. (*Id.* at 5.) The court will take this objection under advisement. The court will hear argument on the appropriateness of this condition at the October sentencing hearing.

---

[7] Defendant's objection appears to mistakenly list paragraph 70, which describes the statutory penalties for the offenses to which she pleaded guilty, instead of paragraph 71, which provides the Guidelines' custody provisions. This error does not impact the court's ruling on these objections.

## V.     CONCLUSION

For the foregoing reasons, the court will overrule Defendant's objection to the 10-level enhancement under U.S.S.G. § 2B1.1, overrule the Government's objection to the lack of an obstruction enhancement under U.S.S.G. § 3C1.1, and rule on the parties' ancillary objections as described above.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 23rd day of August, 2024.

/s/ *Thomas T. Cullen*

HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE